UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
HECTOR SOLER,

                         Plaintiff,

          -against-

NEW YORK RACING ASSOCIATION, INC.
d/b/a NYRA

                         Defendant.
-----------------------------------------------------------------------X

Case No.: **25-CV-2084**

**VERIFIED COMPLAINT**

Jury Trial Demanded

Plaintiff HECTOR SOLER (hereinafter, "PLAINTIFF" or "MR. SOLER"), by and through his undersigned attorneys, PERVEZ & REHMAN, P.C., files this Complaint against Defendant NEW YORK RACING ASSOCIATION, INC. (hereinafter "DEFENDANT" or "NYRA"), stating as follows:

## <u>NATURE OF THE ACTION</u>

1. A dedicated and decorated employee, Mr. Soler worked for twenty-five (25) years at NYRA as the first ever Hispanic and Puerto Rican Head Starter in the history of NYRA. Mr. Soler worked tirelessly to establish himself and advance in an industry historically and predominantly managed by white men. Despite attaining a reputation as one of the preeminent starters in New York horse racing, Mr. Soler faced unlawful discrimination and retaliation in the workplace. In addition to unlawful discrimination and retaliation, Mr. Soler was misclassified as an exempt employee who was ineligible for overtime, when in fact, his duties were manual in nature and he routinely worked over forty (40) hours in a given work week.  Further, NYRA retaliated against Mr. Soler when it

terminated his employment contract "without cause" and then defamed his good character and allowed those who worked for NYRA to leak confidential information about Mr. Soler to the press, casting doubt on his character and the nature of this termination. This action is intended to provide appropriate relief to PLAINTIFF, who was adversely affected by these actions.

**Wage & Hour Claims**

2. This is an action seeking declaratory, injunctive and equitable relief, as well as monetary damages, to redress DEFENDANT's violations of the Fair Labor Standards Act, as amended, 29 U.S.C. §§ 201 et seq. (hereinafter "FLSA"); PLAINTIFF is entitled to recover from DEFENDANT for: (a) unpaid overtime compensation, (b) liquidated damages, (c) prejudgment and post-judgment interest, and (d) attorneys' fees and costs.

3. PLAINTIFF further alleges that, pursuant to the New York Labor Law (hereinafter "NYLL"), he is entitled to recover from DEFENDANT for: (a) unpaid overtime compensation, (b) failure to provide wage notices, (c) failure to provide accurate wage statements, (d) failure to provide timely wages, (e) failure to provide spread of hours pay, (f) liquidated damages, (g) prejudgment and post-judgment interest, and (h) attorneys' fees and costs.

4. Specifically, DEFENDANT violated the FLSA and NYLL by failing to pay PLAINTIFF for any hours worked over forty (40), including overtime hours worked.

**Discrimination**

5. Further, this action seeks damages to redress the injuries PLAINTIFF has suffered as a result of being discriminated against by his employer due to his race, national origin, and disability pursuant to New York State Human Rights Law, New York State Executive

Law, §§ 296 *et seq.*, ("NYSHRL") and the New York City Human Rights Law, Admin. Code § 8-107 *et seq.*, ("NYCHRL").

**Retaliation**

6. Further PLAINTIFF suffered from unlawful retaliation under NYSHRL and NYCHRL when he was terminated for taking protected leave due to a workplace injury.

7. PLAINTIFF also suffered unlawful retaliation under NYSHRL and NYCHRL when he was terminated shortly after he complained of race and national discrimination.

8. PLAINTIFF was also retaliated against under Section 120 of the Workers Compensation Law which makes it unlawful to terminate an employee's employment when he or she files a workers compensation claim under the Workers Compensation Law.

**Cobra Violations**

9. Upon PLAINTIFF's termination, Plaintiff was not provided with or offered continued health coverage under the Consolidated Omnibus Budget Reconciliation Act ("COBRA").

**Common Law Violations**

10. Lastly, this action also seeks relief for DEFENDANT's common law violations pertaining to breach of contract, defamation and negligent supervision.

11. DEFENDANT's conduct resulted in a deprivation of PLAINTIFF's rights, privileges and/or immunities secured by federal law and the laws of New York State.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to 29 U.S.C. §216(b) and 28 U.S.C. §§ 1331.

13. Supplemental jurisdiction over PLAINTIFF's pendent state law claims is conferred by 28 U.S.C. § 1367.

14. Venue is properly laid within the Eastern District of New York pursuant to 28 U.S.C. § 1391(b), because DEFENDANT is located in the Eastern District of New York, and a substantial part of the acts or omissions giving rise to the claim occurred in the Eastern District of New York.

**PARTIES**

*Plaintiff*

15. PLAINTIFF is a resident of Queens, New York.

16. At all relevant times, PLAINTIFF met the definition of an "employee" under the FLSA, NYSHRL and NYCHRL  and other relevant laws.

17. PLAINTIFF identifies as a Puerto Rican man of Hispanic descent.

18. PLAINTIFF was employed by NYRA from December 2001 until his unlawful termination on March 2, 2025.

*Defendant*

19. DEFENDANT is the primary thoroughbred racing authority for horse racing within New York state.

20. DEFENDANT is a New York corporation that is headquartered in Jamaica, NY.

21. DEFENDANT runs thoroughbred horse racing at Aqueduct Racetrack ("Aqueduct"), Belmont Park ("Belmont"), and Saratoga Race Course ("Saratoga"). Aqueduct Races in Queens take place from approximately November to the beginning of April. Races in Belmont take place in Long Island from approximately April to mid-July and from

September to November. Races at Saratoga Race Course in upstate New York, take place from approximately mid-July to Labor Day in September.

22. DEFENDANT employs four (4) or more employees and upon information and belief, over one hundred (100) employees.

23. PLAINTIFF was supervised by Juan Dominguez ("Mr. Dominguez").

**Plaintiff's Work History**

24. DEFENDANT hired PLAINTIFF to work on or about December 2001 and worked up the ranks of NYRA in variety of positions where eventually rose to the ranks of Head Starter,

25. Prior to becoming a Head Starter, PLAINTIFF was hired as an Assistant Starter on December 11, 2001.

26. In 1989, PLAINTIFF worked in Philadelphia as a hotwalker for Joseph Orseno at sixteen (16) years old. PLAINTIFF worked with Mr. Orseno throughout the years in different states as  a hotwalker and learned how to groom horses. Subsequently, PLAINTIFF worked as his groom until 2000.

27. PLAINTIFF was initially hired as a part-time Assistant Starter in the gate at NYRA.

28. PLAINTIFF was paid on a per diem basis upon the inception of his employment with NYRA.

29. In 2008, the Assistant Starters unionized, and PLAINTIFF became eligible for overtime pay.

30. In 2003, PLAINTIFF also worked part-time driving horse vans throughout the U.S. and Canada.

31. In 2004, PLAINTIFF started working part-time for Mersant International as a horse tenant.

32. PLAINTIFF worked all three (3) jobs from 2004 until 2020 when he took the Head Starter position, due to NYRA rules regarding conflicts of interest.

33. PLAINTIFF excelled in his role and received a number of performance commendations from his superiors.

34. In fact, PLAINTIFF received a wealth of accolades for his accomplishments from both domestic and foreign racing authorities, including:

   a. Being the first African American of Hispanic and Puerto Rican descent to become a Head Starter in the U.S. and in the history of NYRA

   b. Receiving a commemoration for being the first Puerto Rican to accomplish this feat.

   c. Being given the key to Vega Baja (PLAINTIFF's native city) for achieving this accomplishment.

   d. Being inducted into the Hall of Fame of Puerto Rican horse racing in Vega Baja.

   e. Being recognized in Camarero Racetrack in Puerto Rico as a representative of Puerto Rican descent within the U.S. thoroughbred racing industry.

   f. Being recognized in Panama Racetrack (Precidente Remon) as a consultant invited by the Minister of Ports for Panama.

   g. Receiving an invitation from the Prince of Saudi Arabia, Fasal, to exchange knowledge and ideas of surrounding starting gates.

   h. Being recognized by Blood Horse and various other news outlets as one of the best starters to work at NYRA.

   i. Being given the opportunity to work as a consultant for Camarero Racetrack.

   j. Receiving an invitation to consult in Mexico, Ecuador and Venezuela.

k. Being named the steeplechase starter for Far Hill races for three (3) consecutive years and being hired by the steeplechase racing association.

l. Receiving an invitation from Bill Galo, the steeplechase commissioner, to discuss racing strategy.

m. Making NYRA history by handling the last Triple Crown winner, Justify.

35. On or about December 11, 2020, PLAINTIFF was offered a promotion to  as NYRA's Head Starter.

36. As a Head Starter, PLAINTIFF was paid a salary and classified as exempt, purportedly for being hired to perform administrative and managerial duties.

37. PLAINTIFF'S initial contract was to run from December 16, 2020 to February 29, 2024. In or around October 2023, the contract was amended because of PLAINTIFF'S exemplary performance and was extended through December 2026.

38. PLAINTIFF's starting salary as Head Starter was $150,000.00, not including bonuses and other benefits.

39. During an event at the Saratoga Race Track on August 4, 2024, PLAINTIFF was injured on the job.

40. PLAINTIFF took protected Workers Compensation leave on September 11, 2024.

41. While on leave, PLAINTIFF received his first negative performance review on December 8, 2024.

42. PLAINTIFF returned to work on or about January 26, 2025.

43. DEFENDANT terminated PLAINTIFF's employment on March 2, 2025.

44. DEFENDANT controlled and set PLAINTIFF's salary and/or rate of pay throughout the duration of his employment.

## FACTUAL ALLEGATIONS

*Plaintiff's Employment with Defendant*

45. PLAINTIFF was employed by DEFENDANT from December 16, 2020 to March 2, 2025 as the Head Starter for NYRA.

46. Prior to being a Head Starter at NYRA, PLAINTIFF worked as an Assistant Starter.

47. The job of Assistant Starter is both physically demanding and dangerous.

48. An Assistant Starter has to ensure that a thoroughbred racehorse, which often weighs more than one thousand (1,000) pounds, is physically and mentally prepared to enter the claustrophobic stalls of a starting gate. These gates often house up to fourteen (14) other horses, and get a fair start in every race contested at NYRA racetracks.

49. As such, PLAINTIFF worked with the more than 2,500 horses stabled at the racetrack both in the mornings, during training hours, and in the afternoon while racing, to ensure both a fair start for all horses in races bet on by the wagering public and a safe start for not only the horses but also for the jockeys who risk their lives everyday on horseback.

50. Each stall is about 2.5 feet wide by 8 feet long, a steel frame with padded panels and padded framework. Assistant Starters will cue the jockey to walk their horse into the stall and then prior to the race, close the back gate doors behind them, often remaining in the starting stall, on a small pontoon to assist the jockey should the horse become obstreperous.

51. In the course of performing the job of Assistant Starter, PLAINTIFF suffered many serious injuries, including but not limited to:

a.  In 2002, PLAINTIFF suffered a right shoulder dislocation because a horse pulled him.

b.  In the same year, his right shoulder popped out and surgery was required to repair it; specifically an arthroscopic Bankart right shoulder repair.

c.  In 2005, PLAINTIFF was kicked by a horse and received a tear in his right hip. A doctor gave him time off and told him he could live with it, intimating that surgery was unnecessary. This injury still bothers PLAINTIFF to this day.

d.  In 2008, PLAINTIFF injured his back while loading a horse into the gate. As a result, he still deals with spinal injuries today, specifically abrasions to his L4 and L5 vertebrae.

e.  In 2010, PLAINTIFF shattered his right elbow when a horse socked back and pinned him to the gate. This injury required surgery to repair the elbow. As a result of this injury, PLAINTIFF has sustained permanent nerve damage (along with carpal tunnel syndrome) in three fingers on his right hand.

f.  In 2011, PLAINTIFF fractured his index finger on his left hand when a horse kicked him while in the gate.

g.  In 2014, while PLAINTIFF was putting a horse in the gate, the horse reared up and kicked him in both the head and forearm. The first aid nurse at NYRA gave PLAINTIFF seven (7) stitches in the NYRA nurse's office. After subsequently meeting with a doctor to discuss the injury, PLAINTIFF was informed that he had nerve damage from the injury.

h. In 2016, PLAINTIFF was leading a horse into the starting gate when he felt his knee snap. Subsequent X-rays showed that it was a torn ACL of his left knee. PLAINTIFF needed surgery and received a total ACL replacement.

i. In 2024 while attending a meet at Saratoga Race Course, PLAINTIFF sustained an injury to his meniscus. This injury required a complete meniscus repair transplant.

j. Apart from the aforementioned injuries that have required surgical invention, PLAINTIFF has sustained countless sub-surgical injuries throughout the course of his employment with NYRA, such as nicks and bruises to his chin, ankles, calves, and hips. Thoroughbred racehorses are not only strong but also high strung and as such, they frequently lunge at the assistant starters who are attempting to assist them. These horses also often flip over backwards, bite, kick, buck and stumble as they are not naturally inclined to be placed in a small starting stall to begin a race. These actions occur on a daily basis, making the job of an assistant starter one of the most dangerous on the racetrack.

52. The role of the Assistant Starter, acting under the direction of the Head Starter, is educating and training these highly skilled but dangerous horses. PLAINTIFF worked for many years as an Assistant Starter, learning the skills required to advance to the position of Head Starter.

53. PLAINTIFF's responsibilities as Head Starter included ensuring that every horse in every race contested at NYRA racetracks, Aqueduct, Belmont, and Saratoga, was properly prepared (schooled) to participate in races bet on by the public and overseeing a crew of

sixteen (16) Assistant Starters for Belmont and Aqueduct seasons and twenty (22) in Saratoga season to complete that task.

54. At Saratoga, PLAINTIFF worked five (5) days a week for an average of 62.5 hours a week,from 6:30 am to 7 pm, Wednesday- Sunday.

55. At Belmont, PLAINTIFF worked five (5) days a week for an average of 57.5 hours a week, from 6:30 am to 6 pm, Wednesday- Sunday.

56. At Aqueduct, PLAINTIFF worked five (5) days a week for an average of 52.5 hours a week, from 6:30 am to 5 pm, Wednesday- Sunday.

57. As such, the role of Head Starter involves some limited managerial duties, but the primary role is non-managerial and physically demanding. More than fifty percent of PLAINTIFF'S working time and responsibilities is manual in nature.

58. The Head Starter's duties include, but are not limited to, organizing the work schedules for all of the members of his crew, for both morning training and afternoon racing hours, maintaining a record of the tendencies of every horse on the grounds who come to the starting gate, so that PLAINTIFF and his crew are aware of any dangerous or distinct tendencies any horse may have to better prepare them for such behaviors.

59. The Head Starter also, on a daily basis, interacts physically with the hundreds of horses that have contact with the starting gate to ensure their safe and proper ingress and egress from the starting gate.

60. This includes physically interacting with the horses both in and around the starting gate before entering, walking horses in and around the starting gate, assisting in loading of the horses into the starting gate, literally standing in the starting gate with the horses, backing the horses in and out of the starting gate to make them more comfortable in a

claustrophobic environment, opening and closing the front and back doors of the starting gate doors with the horse in the gate, and standing patiently with the horse in the starting gate to ease any anxieties the horses may have in the starting gate.

61. The tasks described are time consuming and dangerous. A primary duty of a it is the Head Starter is to not only prepare these horses for their experiences in the starting gate but to prepare them in a manner that protects the betting public also the jockeys and Assistant Starters, whose lives are at risk, interacting with these strong high strung horses, capable of not only injuring but killing the people who participate in this sport of thoroughbred racing.

62. Along with these physically demanding tasks, the Head Starter also has to have the skill and patience to organize the start of every race run at NYRA tracks during the year.

63. Essentially, the Head Starter has to organize and oversee the loading of every horse in every race into the starting gate, making sure all participants are standing properly to ensure a fair start, and at the precise moment in time press a button in his hand opening the front doors of the starting gate releasing thousands of pounds of horse power at the same time for every entrant in a race.

64. PLAINTIFF's duties consisted of a great deal of manual and physically grueling labor.

65. As a Head Starter, PLAINTIFF's starting salary was approximately $150,000.00.

66. At the time of his termination, PLAINTIFF's annual salary was $170,000.00.

67. At all times with working as a Head Starter, PLAINTIFF was classified as an employee exempt from overtime pay.

***Plaintiff's Injury and Subsequent Unlawful Employment Actions Perpetrated by Defendant Retaliation***

68. On August 4, 2024, PLAINTIFF sustained a serious injury while faithfully performing his duties on the racetrack at an event in Saratoga Springs.

69. On August 5, 2024, Juan Dominguez ("Mr. Dominguez"), PLAINTIFF's direct supervisor, was notified of the injury and asked PLAINTIFF to continue working, despite his dire physical condition.

70. Mr. Dominguez stated that no one was able to replace PLAINTIFF, but that PLAINTIFF could take mornings off, if needed, while he recovered from the work-related injury.

71. On August 6, 2024, the injury worsened, and PLAINTIFF was in excruciating pain.

72. On August 12, 2024, PLAINTIFF sought medical attention and was provided with a cortisone injection.

73. On August 26, 2024, PLAINTIFF was prescribed strong pain medication.

74. On September 11, 2024, PLAINTIFF took protected medical leave and eventually filed a workers compensation claim because he was injured while performing his work.

75. On December 8, 2024, while on leave, PLAINTIFF received a negative performance review by Mr. Dominguez, the same individual who insisted that PLAINTIFF continue working through his injury rather than seek medical treatment.

76. This negative performance review was riddled with fabrications and was pretext for NYRA's unlawful retaliation. NYRA retaliated against PLAINTIFF for taking protected leave.

77. In all his years working for NYRA, PLAINTIFF had never received a negative performance review prior to this incident.

78. Upon information and belief, as soon as PLAINTIFF went on protected medical leave, Mr. Dominguez conspired to replace PLAINTIFF by offering his position to other individuals in the industry.

79. Upon information and belief, Mr. Dominguez and NYRA reached out to other potential Head Starter candidates to ask if they were interested in taking over the job. These potential candidates included those who were working outside of NYRA.

80. The process of looking outside of NYRA to find PLAINTIFF'S replacement was evidence of NYRA's discriminatory motives. NYRA sought to replace PLAINTIFF with a white male, rather than the Hispanic individual who was next in line to replace PLAINTIFF, when and if PLAINTIFF left the job of Head Starter of his own accord.

81. As a part of this ploy to replace PLAINTIFF because he took protected leave, Mr. Dominguez insisted that PLAINTIFF extend his medical leave by exhausting vacation leave before returning to work.

82. PLAINTIFF planned to return to work on January 8, 2025 and was contacted by Mr. Dominguez on January 6, 2025, where he insisted that PLAINTIFF take more time off.

83. Upon information and belief, this is because Mr. Dominguez was lining up PLAINTIFF's replacement.

84. Upon information and belief, DEFENDANT issued PLAINTIFF a negative performance review in retaliation for PLAINTIFF taking protected medical leave on September 11, 2024.

85. At the request of Mr. Dominguez, PLAINTIFF extended his vacation until January 26, 2025.

86. After following Mr. Dominguez's request and extending his vacation, on January 10, 2025, Mr. Dominguez sent an email to PLAINTIFF asking him to provide two (2) months notice prior to taking vacation and disciplining him for not providing enough notice of his intent to use vacation time.

87. This email, which copied Andrew Offerman and Tatiana Anita Morales, was bizarre since it was Mr. Dominguez who told PLAINTIFF to take the time off, or else he would lose his vacation days.

88. PLAINTIFF responded with class and thanked Mr. Dominguez for the vacation time afforded.

***Discrimination and Retaliation***

89. On February 13, 2025, after PLAINTIFF resumed his duties, Mr. Dominguez asked PLAINTIFF if he had ever experienced discrimination and racism while working at the gate, to which PLAINTIFF answered yes.

90. PLAINTIFF explained that he was treated differently for being African-American and Hispanic in the past and more recently has also been treated differently and retaliated against for taking protected medical leave and filing a workers compensation claim.

91. Specifically, from 2017 to 2020 while working as an Assistant Starter, PLAINTIFF was often called the N-word and was regularly referred to (incorrectly) as a Mexican.

92. Additionally, Former Head Starter Michael McMullin ("Mr. McMullin") would also throw equipment, uniforms, and programs on the ground and make the Assistant Starters pick them up.

93. PLAINTIFF was also ignored by NYRA colleagues who frequently declined to acknowledge his presence.

94. Additionally, Andrew Offerman is the first Vice President of Racing to not allow PLAINTIFF to have direct contact with him.

95. Pursuant to Mr. Offerman's new procedures, all of PLAINTIFF's decisions now had to be approved by Mr. Dominguez, a departure from prior standard practice at NYRA.

96. Mr. Dominguez has significantly less experience and knowledge of the starting gate than PLAINTIFF.

97. Mr. Dominguez also prohibited PLAINTIFF from speaking to his employees and the trainers.

98. Upon information and belief, NYRA received communication from the Workers Compensation Board dated February 11, 2025.

99. Mr. Offerman, in particular, treated PLAINTIFF poorly since his return from medical leave by ignoring PLAINTIFF and effectively chilling him out of decision making.

100. Since PLAINTIFF returned to work from leave, he noticed Mr. Offerman refused to answer his calls nearly as promptly as he previously used to, nor would he answer PLAINTIFF's questions.

101. Instead, Mr. Offerman would inquire whether PLAINTIFF had taken other measures to resolve the issues at hand.

102. When PLAINTIFF requested meetings to discuss problems in the workplace, Mr. Offerman would tell PLAINTIFF that he was away for work and speak to Mr. Dominguez instead.

103. On or about March 2, 2025, DEFENDANT terminated PLAINTIFF's employment, without cause.

104. Shortly after PLAINTIFF was fired, another Head Starter was quickly hired as an interim by DEFENDANT.

105. This Head Starter was white and was a substitute Head Starter since November, while PLAINTIFF was out on leave.

106. PLAINTIFF was treated differently on account of his race, ethnic origin and disability and suffered adverse employment actions, including termination, after taking protected leave, complaining about discrimination, filing workers compensation claims.

*Defamation and Negligent Supervision*

107. In the process of unlawfully terminating PLAINTIFF, DEFENDANT and its agents negligently or intentionally created false rumors that PLAINTIFF engaged in conduct that warranted his dismissal.

108. It is undisputed by DEFENDANT that PLAINTIFF is allegedly being terminated without cause (pretext for NYRA's retaliation).

109. On March 3, 2025, Mr. Soler received a "Trespass Notice" which stated that he was banned from NYRA property, including Aqueduct, Belmont and Saratoga, for a period of ninety (90) days which could be extended at the discretion of NYRA's management. If Mr. Soler violated this notice, he would be subject to arrest and/or criminal charges.

110. Upon information and belief, simultaneously with this notice, a BOLE photo of Mr. Soler was released to NYRA's security team, for the purpose of ensuring that Mr. Soler abided by the Trespass Notice. This BOLE contained a "mug shot" like picture of PLAINTIFF, along with identifying characteristics like his date of birth, hair and eye color, height and weight.

111.    However, DEFENDANT willfully or negligently allowed for the public release of PLAINTIFF's BOLE photo.

112.    The BOLE photo was published by or through the negligent actions of DEFENDANT's employee(s) while employed by NYRA.

113.    The publication of this picture led to innuendo and speculation that Mr. Soler had acted improperly, unprofessionally, or worse, unlawfully.

114.    While these allegations are completely unfounded, PLAINTIFF has suffered severe reputational damage as a result of DEFENDANT's willful or negligent publication of these pictures.

115.    The BOLE photo of Mr. Soler should never have been disseminated publicly.

116.    PLAINTIFF was and continues to be forced to field phone calls from colleagues and professionals in the industry where he must defend his character and innocence from such spurious accusations.

117.    NYRA failed to supervise its employees to prevent the release of confidential information relating to PLAINTIFF.

***NYLL §§ 195(1) and NYLL §§ 195(3) Claims - Failure to Provide Wage Notices and Wage Statements.***

118.    PLAINTIFF also brings claims for failure to provide accurate wage notices and wage statements pursuant to NYLL §§ 195 *et seq.* and the supporting regulations.

119.    DEFENDANT failed to provide PLAINTIFF with accurate wage notices stating the actual number of hours worked by PLAINTIFF, in an attempt to disguise PLAINTIFF's

rate of pay, how he was being compensated, whether he was entitled to an overtime rate, and whether he was accurately classified as exempt from overtime pay.

120.   Failing to provide PLAINTIFF with a document that classified him as an hourly or salaried employee, and identifying how PLAINTIFF was to be paid (hourly or salaried, exempt or non-exempt) prevented PLAINTIFF from realizing that he was underpaid and was improperly classified, which deprived PLAINTIFF of information that directly led to the underpayment of wages.

121.   This also prevented PLAINTIFF from raising the issue directly with his employer, and  directly delayed payment of PLAINTIFF's wages longer than if DEFENDANT would have provided the information which would have allowed PLAINTIFF to raise his underpayment to his employer at an earlier time.

122.   Had DEFENDANT provided PLAINTIFF with this information, PLAINTIFF would have understood how he was being classified, how he was being paid, and been able to identify discrepancies between the number of hours worked and the pay he received.

123.   Not only was PLAINTIFF not paid what he was owed, but he was denied the information needed to advocate for proper pay, resulting in a concrete injury beyond a statutory violation.

124.   Failing to provide the proper legal name of the employer on the wage notices, as required by NYLL §195, delayed PLAINTIFF's ability to recover unpaid wages through legal action against DEFENDANT.

125.   Upon information and belief, failure to provide wage notices was designed to disguise and avoid paying PLAINTIFF wages and overtime for all hours worked, which directly resulted in a delay in compensation and underpayment.

126.    Had DEFENDANT provided the information required by the law in the wage notices, PLAINTIFF would have been able to prevent or shorten the period of underpayment. Thus, the failure to provide the required information under the law proximately resulted in a concrete injury - the monetary harm of the underpayment. This failure proximately caused the delay in payment which proximately deprived PLAINTIFF with the time-value of his compensation (value of money today v. value of money tomorrow) which is a separate and concrete monetary injury distinct from the failure to provide the information itself.

127.    DEFENDANT's failure to provide accurate wage statements which failed to identify the accurate number of hours PLAINTIFF worked per week, his hourly rate and his overtime rate, or the basis for his pay, denied PLAINTIFF his statutory right to receive true and complete information about the nature of his employment. This includes but is not limited to, DEFENDANT's compensation policies for PLAINTIFF and whether they were being properly classified, which directly resulted in delay of compensation and the underpayment of wages.

128.    DEFENDANT's failure to provide accurate wage statements denied PLAINTIFF the right to be adequately apprised of the compensation policies DEFENDANT applied to PLAINTIFF and upon information and belief continued DEFENDANT's efforts to disguise and prevent PLAINTIFF from realizing the true nature of his compensation.

129.    The aforementioned failure also prevented PLAINTIFF from raising underpayment and improper classification complaints via advocating directly to his employer, thereby proximately resulting in underpayment and the delay of providing proper compensation and depriving PLAINTIFF with the time-value of his compensation (value of money

today v. value of money tomorrow), which is a separate and concrete monetary injury distinct from the failure to provide the information itself.

130.    Defendant failed to apprise PLAINTIFF of the required information needed to evaluate and stop the wage theft experienced by PLAINTIFF, which is precisely the downstream harm these statutes seek to prevent.

131.    As a proximate result of the failure to provide the wage notices and wage statements, PLAINTIFF suffered the concrete, non-hypothetical harm described above, which is fairly traceable to the failure to provide the wage notices and statements, including but not limited to the delayed compensation and accordant deprivation of the time-value of money, which rendered PLAINTIFF unable to use his wages to invest, save, and purchase in a manner that he would have if had received the information earlier and been able to raise the issue with his employer and/or recover proper wages earlier as required under the law.

## FIRST CAUSE OF ACTION

## (Violations of the Fair Labor Standards Act - 29 U.S.C. §§ 201 et seq - Unpaid Overtime)

132.    PLAINTIFF incorporates by reference every allegation set forth in this Complaint as if fully set forth herein.

133.    At all relevant times, and upon information and belief, DEFENDANT was and continues to be engaged in interstate commerce within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207 (a).

134.    PLAINTIFF is a covered individual within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

135. At all relevant times, DEFENDANT employed PLAINTIFF within the meaning of the FLSA.

136. DEFENDANT had gross revenues in excess of $500,000.00 within the three (3) most recent years relevant herein.

137. DEFENDANT classified PLAINTIFF as an exempt employee, despite the fact that the vast majority of his work involved manual labor.

138. PLAINTIFF worked as a manual laborer and more than twenty-five percent (25%) of his workday involved manual work including walking horses in and around the starting gate, assisting in loading of the horses into the starting gate, standing in the starting gate with the horses, backing the horses in and out of the starting gate to make them more comfortable in a claustrophobic environment, and opening and closing the front and back doors of the starting gate doors.

139. As such, PLAINTIFF was entitled to be paid weekly and no later than seven calendar days after the end of the week in which wages are earned, pursuant to NYLL §19l(l)(a)

140. It was DEFENDANT's policy to only pay PLAINTIFF for forty (40) hours worked per week, despite the fact that PLAINTIFF worked in excess of forty (40) hours in a week on a regular basis.

141. At Saratoga, PLAINTIFF worked 5 days a week for an average of 62.5 hours a week, from 6:30 am to 7 pm, Wednesday- Sunday.

142. At Belmont, PLAINTIFF worked 5 days a week for an average of 57.5 hours a week, from 6:30 am to 6 pm, Wednesday- Sunday.

143. At Aqueduct, PLAINTIFF worked 5 days a week for an average of 52.5 hours a week, from 6:30 am to 5 pm, Wednesday- Sunday.

144. DEFENDANT willfully violated PLAINTIFF's rights by failing to pay overtime compensation at a rate of not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of forty (40) each week, in violation of the FLSA, 29 U.S.C. §§ 201 et seq., including 29 U.S.C. §§ 207(a)(1) and 215(a)(2).

145. DEFENDANT did not require PLAINTIFF to punch in or punch out at the beginning and end of a shift and DEFENDANT did not maintain time records.

146. The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

147. DEFENDANT willfully, regularly, and repeatedly failed to pay overtime compensation, which caused PLAINTIFF to suffer loss of wages and interest thereon. PLAINTIFF is entitled to recover from DEFENDANT his unpaid overtime premium compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees and costs and disbursements of the action pursuant to 29 U.S.C. § 216(b).

148. As a result of DEFENDANT's willful and unlawful conduct, PLAINTIFF is entitled to an award of damages, including liquidated damages, in an amount to be determined at trial, pre and post judgment interest and attorneys fees and costs.

## SECOND CAUSE OF ACTION

### (Violations of the New York Labor Law - Unpaid Overtime)

149. PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

150. DEFENDANT willfully violated PLAINTIFF's rights by failing to pay overtime compensation at a rate of not less than one and one-half (1.5) times the regular rate of pay for hours worked in excess of forty (40) each week, in violation of the NYLL and regulations promulgated thereunder.

151. DEFENDANT willfully, regularly, and repeatedly failed to pay overtime premium compensation and caused PLAINTIFF to suffer loss of wages and interest thereon. PLAINTIFF is entitled to recover from DEFENDANT his unpaid overtime compensation, damages for unreasonably delayed payment of wages, liquidated damages, reasonable attorneys' fees, and costs and disbursements of the action pursuant to the NYLL.

152. As a result of DEFENDANT's willful and unlawful conduct, PLAINTIFF is entitled to an award of damages, including liquidated damages, in an amount to be determined at trial, pre and post judgment interest and attorneys fees and costs.

## THIRD CAUSE OF ACTION

### (Violations of the New York Labor Law - Failure to Provide Wage Notice)

153. PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

154. DEFENDANT willfully failed to supply PLAINTIFF with notice as required by Article 6, § 195(1), in English or in the language identified by PLAINTIFF as his primary language, containing PLAINTIFF's rate of pay and basis thereof, whether by the hour, shift, day, week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay, if applicable; the regular pay designated by the employer in

accordance with the New York Labor Law, Article 6, § 191; the name of the employer; or any "doing business as" names used by the employer, the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary.

155.    Due to DEFENDANT's violations of the NYLL, PLAINTIFF is entitled to recover from DEFENDANT fifty dollars ($50.00) for each work day that the violations occurred or continued to occur, up to a maximum of five thousand dollars ($5,000), as provided for by NYLL, Article 6, §§ 190 *et seq.*, in addition to reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## FOURTH CAUSE OF ACTION

### (Violations of the New York Labor Law - Failure to Provide Accurate Wage Statements)

156.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

157.    DEFENDANT willfully failed to supply PLAINTIFF with an accurate statement of wages as required by NYLL, Article 6, § 195(3), containing the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; and net wages.

158.    Due to DEFENDANT's violations of the NYLL, PLAINTIFF is entitled to recover from DEFENDANT two hundred and fifty dollars ($250.00) for each day that the violations occurred or continued to occur, or a total of five thousand dollars ($5,000.00), as provided for by NYLL, Article 6, §§ 190 *et seq.*, in addition to reasonable attorneys' fees, costs, and injunctive and declaratory relief.

## FIFTH CAUSE OF ACTION

### (Violations of New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq* - Unlawful Discrimination)

159.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

160.    DEFENDANT engaged in discriminatory practices against PLAINTIFF including, without limitation, disparate treatment.

161.    DEFENDANT's discriminatory actions against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

162.    The acts complained of were perpetrated against PLAINTIFF because of his disability, race and national origin.

163.    As a result of DEFENDANT's actions, PLAINTIFF experienced loss of income, loss of future earnings, constructive discharge, anxiety, physical injury, severe humiliation, shame, embarrassment, emotional pain and suffering, and loss of enjoyment of life.

## SIXTH CAUSE OF ACTION

**(Violations of New York City Human Rights Law, Admin. Code § 8-107 *et seq.*,**

**("NYCHRL" - Unlawful Discrimination).**

164. PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

165. DEFENDANT engaged in discriminatory practices against PLAINTIFF including, without limitation, disparate treatment.

166. DEFENDANT's discriminatory actions against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

167. The acts complained of were perpetrated against PLAINTIFF because of his disability, race and national origin.

168. As a result of DEFENDANT's actions, PLAINTIFF experienced loss of income, loss of future earnings, constructive discharge, anxiety, physical injury, severe humiliation, shame, embarrassment, emotional pain and suffering, and loss of enjoyment of life.

**SEVENTH CAUSE OF ACTION**

**(Violations of New York State Human Rights Law, New York State Executive Law,**

**§§ 296 *et seq* - Unlawful Retaliation)**

169. PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

170. DEFENDANT engaged in unlawful retaliatory practices against PLAINTIFF, including but not limited to, issuing him a negative performance review for complaining about discrimination based on race and national origin and for taking protected Workers' Compensation leave.

171.    DEFENDANT's retaliatory actions against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

172.    As a result of DEFENDANT's actions, PLAINTIFF experienced both economic and emotional losses. PLAINTIFF has suffered loss of income, loss of future earnings, depression, anxiety, stress, loss of appetite, and loss of sleep as a result of the discrimination and retaliation.

173.    PLAINTIFF has had to seek professional help and medical treatment after the termination of his employment in order to cope with his mental distress.

## EIGHTH CAUSE OF ACTION

### (Violations of New York City Human Rights Law ("NYCHRL") § 8-107 - Unlawful Retaliation)

174.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

175.    DEFENDANT engaged in unlawful retaliatory practices against PLAINTIFF which violated New York City Administrative Code §8-107.

176.    These unlawful retaliatory practices against PLAINTIFF included but were not limited to issuing him a negative performance review for complaining about discrimination based on race and national origin and for taking protected Workers' Compensation leave.

177.    DEFENDANT's retaliatory actions against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

178.    As a result of DEFENDANT's actions, PLAINTIFF experienced both economic and emotional losses. PLAINTIFF has suffered loss of income, loss of future earnings, depression, anxiety, stress, loss of appetite, and loss of sleep as a result of the discrimination and retaliation.

179.    PLAINTIFF has had to seek professional help and had to seek medical treatment after the termination of his employment to cope with mental distress.

180.    DEFENDANT's intentional violation of PLAINTIFF's rights was shocking and egregious and entitles PLAINTIFF to recover punitive damages.

## NINTH CAUSE OF ACTION

### (Violations of Section 120 of the Workers Compensation Law - Unlawful Retaliation)

181.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

182.    DEFENDANT engaged in unlawful retaliatory practices against PLAINTIFF after learning that PLAINTIFF filed a workers compensation claim.

183.    DEFENDANT's retaliatory actions against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

184.    As a result of DEFENDANT's actions, PLAINTIFF experienced both economic and emotional losses. PLAINTIFF has suffered loss of income, loss of future earnings, depression, anxiety, stress, loss of appetite, and loss of sleep as a result of the discrimination and retaliation.

185. PLAINTIFF has had to seek professional help and medical treatment after the termination of his employment in order to cope with his mental distress.

186. DEFENDANT's intentional violation of PLAINTIFF's rights was shocking and egregious and thus entitles PLAINTIFF to recover punitive damages.

## TENTH CAUSE OF ACTION

### (Violations of New York Labor Law § 215 - Unlawful Retaliation)

187. PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

188. DEFENDANT engaged in unlawful retaliatory practices against PLAINTIFF, including but not limited to, issuing him a negative performance review for complaining about discrimination based on race and national origin and for taking protected Workers' Compensation leave.

189. DEFENDANT's retaliatory actions against PLAINTIFF affected the status, terms, conditions, and privileges of his employment.

190. As a result of DEFENDANT's actions, PLAINTIFF experienced both economic and emotional losses. PLAINTIFF has suffered loss of income, loss of future earnings, depression, anxiety, stress, loss of appetite, and loss of sleep as a result of the discrimination and retaliation.

191. PLAINTIFF has had to seek professional help and medical treatment after the termination of his employment in order to cope with his mental distress.

192. DEFENDANT's intentional violation of PLAINTIFF's rights was shocking and egregious and thus entitles PLAINTIFF to recover punitive damages.

## ELEVENTH CAUSE OF ACTION

### (Common Law Violation of Breach of Contract)

193.   PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

194.   At the inception of PLAINTIFF's employment with DEFENDANT, the parties entered into a contract that featured an offer, an acceptance, and mutual assent. The agreement was also furnished by the consideration of PLAINTIFF to work for DEFENDANT at the agreed-upon terms; DEFENDANT in turn agreed to pay PLAINTIFF $150,000.00 to work as a Head Starter from December 2020 to February 2024.

195.   PLAINTIFF'S employment contract was extended for an additional term to expire in December 2026.

196.   PLAINTIFF upheld his end of the agreement by dutifully performing his role as the Head Starter.

197.   However, DEFENDANT breached this agreement when it unlawfully terminated PLAINTIFF in retaliation for taking protected medical leave and complaining about discrimination, in violation of the agreed-upon terms of their contract.

198.   As a result of DEFENDANT's breach, PLAINTIFF experienced damages, direct and consequential monetary damages, including but not limited to loss of income, loss of future earnings, constructive discharge, anxiety, physical injury, severe humiliation, shame, embarrassment, emotional pain and suffering, and loss of enjoyment of life.

## TWELFTH CAUSE OF ACTION

### (Common Law Violation of Defamation)

199.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

200.    In the process of unlawfully terminating PLAINTIFF, DEFENDANT and its agents willfully or negligently allowed for the publication of PLAINTIFF's BOLE photo and a purported "mug shot" of PLAINTIFF.

201.    The publication of these photos lead to innuendo and speculation that Mr. Soler has acted improperly, unprofessionally, or worse, unlawfully.

202.    PLAINTIFF has suffered severe reputational damage and public disgrace within the horse racing industry as a result of DEFENDANT's willful or negligent publication of these pictures.

203.    DEFENDANT was negligent in disseminating the confidential information about Mr. Soler and the trespass notice which was meant only for NYRA's security personnel.

204.    As a result of DEFENDANT's conduct, PLAINTIFF suffered special harm, including but not limited to reputational damage, loss of future earnings, anxiety, severe humiliation, shame, embarrassment, emotional pain and suffering, and loss of enjoyment of life.

## THIRTEENTH CAUSE OF ACTION

### (Common Law Violation of Negligent Supervision)

205.    PLAINTIFF repeats and realleges each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

206. Under DEFENDANT's supervision, an employee of NYRA published the aforementioned defamatory BOLE photo of PLAINTIFF which publicized PLAINTIFF'S ninety (90) day ban from the NYRA premises and subsequent reputational damage within the horse racing industry.

207. The person who published the defamatory picture was an agent or employee of DEFENDANT at the time of the picture's publication.

208. As the supervisor of this employee, DEFENDANT had a duty to know of all employment activities that the employee had been assigned and the manner in which said assignments were to be performed.

209. Upon information and belief, the publication of the defamatory BOLE picture of PLAINTIFF occurred on one of DEFENDANT's computers.

210. Upon information and belief, the publication of the defamatory BOLE picture of PLAINTIFF occurred while the employee was on DEFENDANT's premises.

211. As his employer, DEFENDANT had a duty not to allow for defamatory pictures of PLAINTIFF to be published.

212. DEFENDANT breached this duty when it negligently or willfully failed to properly supervise its subordinate employees.

213. This breach of duty owed to PLAINTIFF proximately caused PLAINTIFF's injuries, as but for the publication of the defamatory picture, PLAINTIFF would not be in the predicament he is currently in.

214. As a direct result of DEFENDANT's breach, PLAINTIFF has been injured. These injuries include but are not limited to: severe reputational damage within the horse racing industry and an inability to find comparable employment opportunities.

## PRAYER FOR RELIEF

**WHEREFORE**, upon all of the facts, allegations, and causes of action as set forth and alleged herein, PLAINTIFF respectfully requests that this Court:

A. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the NYLL;

B. An award of compensatory damages as a result of DEFENDANT's failure to pay minimum wage and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

C. An award of liquidated and/or punitive damages as a result of DEFENDANT's willful failure to pay minimum wages and overtime compensation pursuant to the FLSA and the NYLL and supporting regulations;

D. An award of fifty dollars ($50.00) for each work day that the violations of NYLL, Article 6 § 195(1) occurred or continued to occur, up to a maximum of five thousand ($5,000.00) as provided for by NYLL, Article 6 198(1)-b;

E. An award of two hundred and fifty dollars ($250.00) for each day that the violations of NYLL, Article 6 § 195(3) occurred or continued to occur, up to a maximum of five thousand dollars ($5,000.00) as provided for by NYLL, Article 6 § 198(1)-d;

F. An award of full wages, benefits and wage supplements and liquidated damages accrued during the six years previous to the commencing of this action for violations of N.Y. Lab. L. § 191(1)(a), and half of the total wages that should have been paid on a weekly basis as liquidated damages.

G. An award of back pay, front pay, emotional damages for discriminatory and retaliatory conduct and all other available damages under the law;

H. An award of prejudgment and post-judgment interest;

I. An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

J. Such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues so triable.

Dated: Commack, New York
      April 11, 2025

Respectfully Submitted,


**Pervez & Rehman, P.C.**
*Attorneys for Plaintiff*

/s/Nadia M. Pervez, Esq.
By: Nadia M. Pervez, Esq.
Aneeba Rehman, Esq.
6268 Jericho Turnpike, Suite 8,
Commack, NY 11725

/s/Andrew J. Mollica, Esq.
By: Andrew J. Mollica, Esq.
1205 Franklin Ave, Suite 16LL
Garden City, NY 11530

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
HECTOR SOLER,

                        Plaintiff,                              Case No.:

            -against-                                          **VERIFIED COMPLAINT**

NEW YORK RACING ASSOCIATION, INC.                              Jury Trial Demanded
d/b/a NYRA

                        Defendant.
-----------------------------------------------------------------X


I, HECTOR SOLER, am the Plaintiff in the within action for. I have read the foregoing
Complaint and know the contents thereof. The contents are true to my own knowledge except as
to matters therein stated to be alleged upon information and belief, and as to those matters, I
believe them to be true.

_____
Hector Soler


Sworn to before me on this _____ day

of _____, 2025.



_____
Notary Public

ANDREW J MOLLICA
Notary Public, State of New York
No. 02MO6236968
Qualified in Nassau County
Commission Expires March 14, 20__